UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. CARL KRAWITT, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>INFOSYS TECHNOLOGIES LIMITED, INCORPORATED and APPLE INCORPORATED,<br><br>Defendants. | Case No. 16-CV-04141-LHK<br><br>**ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT**<br><br>Re: Dkt. Nos. 84, 85 |

*Qui Tam* Plaintiff Carl Krawitt ("Krawitt") brings suit against Defendants Infosys Technologies, Ltd. ("Infosys") and Apple Inc. ("Apple") (collectively, "Defendants") under the False Claims Act. The suit alleges that the Defendants conspired to have two Indian nationals enter the United States on a business B-1 visa to provide training at Apple in violation of immigration laws. Krawitt instead insists that the two trainers ought to have obtained the more expensive and numerically-capped H1-B visas before entering the United States. Before the Court are Apple's motion to dismiss, ECF No. 84 ("Mot."), and Infosys' motion to dismiss, ECF No. 85. Having considered the parties' submissions, the relevant law, and the record in this case, the Court

1

GRANTS Apple's motion to dismiss with prejudice, and DENIES Infosys' motion to dismiss as moot.

## I. BACKGROUND

### A. Factual Background

Infosys is an Indian corporation "specializing in information technology consulting, training, and outsourcing services . . . ." ECF No. 77 at ¶¶ 5, 40 (second amended complaint, or "SAC"). "Infosys brings foreign nationals into the United States and provides such resources to American clients from outsourcing centers in India . . . ." *Id.* One of Infosys' clients is Apple. *Id.* at ¶ 12. Infosys and Apple entered into a $50,000 contract (the "Agile Contract") for Infosys to provide Apple's Online Store Engineering Organization with 16 live training sessions in California. *Id.* Krawitt alleges that the training sessions included "'paired training,' in which both instructor and trainee take turns writing and revising computer code." *Id.*

A B-1 visa is issued to a nonimmigrant entering the United States temporarily for business. 22 C.F.R. § 41.31(a). On the other hand, an H1-B visa allows employment in the United States for a set duration. SAC at ¶ 8. Unlike B-1 visas, which are unlimited in number, H1-B visas are subject to a numerical cap and are more expensive to obtain than B-1 visas. *Id.*

It is alleged that during negotiations over the Agile Contract with Apple, Infosys executives "knew Infosys lacked sufficient foreign nationals on H1-B visas to legally perform the classroom training sessions at Apple." *Id.* at ¶ 13. The SAC further alleges that Infosys executives knew that "only Indian foreign national workers on B-1 visas were available to perform services under the Agile Contract." *Id.* In particular, Sreekumar Vobugarihad and Vijay Dani, 2 Indian nationals holding B-1 visas, were scheduled to be the trainers under the Agile Contract.[1] *Id.* at ¶ 15.

---

[1] This is not the first time Infosys has been accused of violating immigration laws. On October 30, 2013, Infosys settled a case with the United States in which the government accused Infosys of, among other things, sending foreign nationals to work in the United States on B-1 visas to avoid having to apply for H1-B visas. *Id.* at ¶ 7. That case was before the United States District Court for the Eastern District of Texas. *Id.* at ¶ 7.

2
Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

On September 10, 2014, Krawitt started work at Apple as an independent contractor for Infosys. *Id.* He allegedly warned Infosys employees and superiors that the Vobugarihad and Dani lacked the necessary H1-B visas to conduct the training courses. *Id.* Krawitt also claims that Apple Senior Manager Marcus East was aware that the two trainers were on B-1 visas, yet East approved the Infosys training curriculum anyways. *Id.* On September 15, 2014, Krawitt drafted a project memorandum for the Agile Contract, which was later presented to Apple's managers. *Id.* at ¶ 16. The project memorandum contained information about the qualifications of the trainers, "thereby further informing [Apple executives] . . . that Infosys intended on bringing Indian foreign nationals . . . on B-1 visas as the workers under the Agile Contract." *Id.*

On September 24, 2014, at the request of Infosys employees, Apple Senior Manager East provided Infosys with draft letters to be used by Vobugarihad and Dani to enter the United States on their previously-issued B-1 visas. *Id.* at ¶ 17. These letters did not mention that the trainers would conduct training sessions under the Agile Contract, nor did they mention that the trainers would "perform substantive work in taking 'existing processes and adapting them to systematize them.'" *Id.* Rather, the letters stated that the 2 trainers would attend "education meetings to share and learn the Agile Software Development Concepts & Methodology." *Id.* The letters allegedly falsely stated that the trainers would not be paid, "when in fact the training and substantive services provided by Vobugarihad and Dani were the only reason that Apple was paying Infosys $50,000 and the trainers received trickle down compensation from Infosys for this work." *Id.* The draft letters were circulated at Infosys and Apple, and then finalized on Apple letterhead with East's signature. *Id.* at ¶ 20.

When Krawitt learned about the letters and "this scheme between Infosys and Apple," Krawitt notified his immediate supervisor at Infosys on September 25, 2014. *Id.* at ¶ 23. Krawitt's supervisor declined to discuss the issue with Krawitt. *Id.* Around October 6, 2014, Krawitt notified another Infosys employee, Razab Chowdhury, that Infosys was violating immigration laws, and that the matter should be referred to Infosys' legal department for investigation. *Id.* Chowdury

3

agreed to refer the matter to the legal department, but the only action Chowdhury took was to warn other Infosys executives that Krawitt had raised the visa issue and that "it would be a potential problem." *Id.* Krawitt also continued to write about the visa issue in project status updates reviewed by Apple and Infosys employees. *Id.*

On October 8, 2014, an Infosys employee emailed other Infosys executives that the two trainers "needed to travel back to India, and then return to the United States in order to avoid detection and suspicion for violating United States immigration laws." *Id.* at ¶ 24. One day later, Krawitt and Chowdhury discussed the prior Eastern District of Texas case against Infosys. *Id.* at ¶ 25. Chowdhury stated that if he "got caught" for manipulating visa applications, he would "pretend as if he knew nothing." *Id.* On the same day, Krawitt allegedly spoke with an Infosys executive "who confirmed Relator Krawitt's suspicions about Infosys's immigration visa violations." *Id.* at ¶ 26.

The Agile Contract training sessions proceeded with the two Indian foreign nationals as trainers, but on October 16, 2014, Apple Senior Manager East told Infosys he was unhappy with the training sessions. *Id.* at ¶¶ 27-28. Infosys thereby sent the 2 Indian trainers back to India, and the remainder of the classes under the Agile Contract was cancelled. *Id.* at ¶ 28. Apple, wishing to continue with further training, subsequently entered into another agreement with Infosys wherein a United States-based trainer was to deliver the remaining training sessions at a cost of $250,000. *Id.* at ¶ 30. Krawitt accuses Apple and Infosys employees of intentionally omitting "training" from this subsequent agreement's terms. *Id.* at ¶ 29.

Around January 2015, Krawitt's employment at Infosys was not extended, allegedly as retaliation for whistleblowing on the B-1 visa issue. *Id.* at ¶ 31. In March 2015, Krawitt began new employment at Apple as a contractor supervised by managers who were part of the Retail Online Store Engineering Management Team. *Id.* at ¶ 34. Around October 2015, Krawitt attended an Apple team meeting with East and others. *Id.* at ¶ 35. During the meeting, East "urged the Retail Online Store Engineering Management Team to 'pressure' outside vendors with employees on

4

temporary worker visas in the United States to require that those employees work for free until Apple management approved new contracts for them." *Id.* On October 26, 2015, Krawitt's work as an Apple contractor was not renewed. *Id.* at ¶ 36. On information and belief, Krawitt alleges that Apple conducted an internal investigation into the misuse of B-1 visas, violations which took place under East's guidance. *Id.* at ¶ 37. This internal investigation allegedly led East to quit his job. *Id.* at ¶ 32.

### B. Procedural History

Krawitt's original complaint against Defendants was filed on July 22, 2016. ECF No. 1. On September 26, 2017, the government declined to intervene in the case. ECF No. 13. The first amended complaint ("FAC") was filed on April 16, 2018. ECF No. 37. The government has not intervened after the FAC was filed. The original complaint and the FAC contain only one cause of action: a violation of the False Claims Act ("FCA"). *See* ECF No. 1 at § VI; FAC at ¶¶ 56-59.

Infosys and Apple both filed motions to dismiss the FAC on June 15, 2018. ECF Nos. 55, 56. On October 16, 2018, the Court issued an order granting Apple's motion to dismiss and denied Infosys' motion to dismiss as moot. ECF No. 76; *United States ex rel. Krawitt v. Infosys Techs. Ltd.*, (N.D. Cal. 2018). The order held that "the two trainers acted within the scope of their B-1 visas in providing training sessions to Apple." 342 F. Supp. 3d at 964. Moreover, the order held that "assuming *arguendo* that the trainers were incorrectly admitted into the United States on B-1 visas, Apple and Infosys do not have the requisite scienter to be charged with a violation of the FCA." *Id.* at 966. Thus, Krawitt's FAC was dismissed with leave to amend.

On November 15, 2018, Krawitt filed the SAC. ECF No. 77. On November 29, 2018, both Apple and Infosys filed separate motions to dismiss. ECF Nos. 84, 85. On January 4, 2019, Krawitt filed his opposition to both motions. ECF Nos. 90 ("Opp."), 91. On January 18, 2019, Apple and Infosys filed their replies. ECF Nos. 92 ("Reply"), 93. Infosys joins Apple's motion to dismiss. ECF No. 85 at 2.

## II. LEGAL STANDARD

5

Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). The U.S. Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### B. Motion to Dismiss Under Federal Rule of Civil Procedure 9(b)

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Under the federal rules, a plaintiff alleging fraud "must state with particularity the circumstances

6

constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this standard, the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted). The plaintiff must also plead facts explaining why the statement was false when it was made. *See In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F. Supp. 1297 (C.D. Cal. 1996).

"When an entire complaint … is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint … ." *Vess*, 317 F.3d at 1107. The Ninth Circuit has recognized that "it is established law in this and other circuits that such dismissals are appropriate," even though "there is no explicit basis in the text of the federal rules for the dismissal of a complaint for failure to satisfy 9(b)." *Id.* A motion to dismiss a complaint "under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Id.*

**C. Leave to Amend**

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks

7

Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

omitted). When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

Infosys and Apple have different rationales for why the SAC should be dismissed. For the reasons set forth below, the Court grants Apple's motion, which Infosys joins, then denies Infosys' motion as moot.

Apple advances four grounds on which to dismiss the SAC. First, Apple argues that the trainers' activities were permissible under their B-1 visas. Second, Apple asserts that Krawitt cannot establish scienter. Third, Apple contends that Krawitt fails to plead facts establishing the materiality of the invitation letters. Fourth, Apple posits that the SAC is specifically deficient as to Apple. The Court finds Apple's first two arguments dispositive, and need not address the remainder.

### A. Whether the Trainers' Activities were Permissible under B-1 Visas

First, Apple argues that the two trainers' activities in the United States were permissible under B-1 visas. The Court agrees.

The Court's previous order dismissing Krawitt's claims relied upon a three-prong test developed by the Board of Immigration Appeals ("BIA") for what constitutes business qualifying for a B-1 visa:

> (1) [T]he alien clearly intends to maintain a foreign residence and domicile; (2) the principal place of business and the place where the profit predominantly accrues is in a foreign country; and (3) each business entry is clearly temporary in character, even if the nature of the business activity itself is not temporary and may be long continued.

8

ECF No. 76 at 8; *Krawitt*, 342 F. Supp. 3d at 964 (citing *Matter of Hira*, 11 I. & N. Dec. 824 (B.I.A. 1966); *Matter of G-P-*, 4 I. & N. Dec. 217, 221-22 (B.I.A. Central Office 1950)).

Admittedly, the law on the definition of "business" is rather ambiguous. *See, e.g.*, 2 Immigration Law & Procedure § 14.05 (2018) ("What is wanting, is a consistent reading of the B-1 provision . . . [,] one that preserves an appropriate tension between the bar to ordinary labor and the requirements of international business."); 9 Foreign Affairs Manual ("FAM") 402.2-5(A)(b) ("It can be difficult to distinguish between appropriate B1 business activities, and activities that constitute skilled or unskilled labor in the United States that are not appropriate on B status."). However, the FAM praises *Matter of Hira* as still providing "[t]he clearest legal definition" of what constitutes business activity. *Id*. Moreover, in federal regulations, the Department of Justice and the Immigration and Naturalization Service have referred to *Matter of Hira* to define the scope of allowed business activities under a B-1 visa. *See* 58 Fed. Reg. 58982, 58983 (Nov. 5, 1993).

Krawitt does not dispute that the two trainers intended to maintain their residence in India, and that their entry into the United States was temporary in nature. These are the first and third prongs of the BIA test of what constitutes legitimate business activity under a B-1 visa. Thus, the Court turns to the second prong: where the principal place of business is, and where the profit predominantly accrues. The Court finds that the principal place of business and where profit predominately accrues is India, which satisfies the second prong.

The instant case can be closely analogized to *Matter of Hira*. In *Matter of Hira*, a Hong Kong suit manufacturer sent Hira to the United States to take customers' measurements for suits to be made in Hong Kong. 11 I. & N. Dec. at 825. Payment for the suits was remitted to the Hong Kong manufacturer, which then paid Hira in Hong Kong. *Id.* Likewise, the principal place of business of both Infosys, which is based in Bangalore, India, and the two trainers, who are based in India, is overseas. SAC at ¶¶ 13, 40. Though Apple did pay Infosys $50,000 under the Agile Contract for the training sessions, this money *did not* go directly to the two trainers. *Id.* at ¶ 17 ("Apple was paying Infosys $50,000 . . . ."). The money went to Infosys. *Id.*

9

Krawitt concedes that the two trainers in the instant case received "*compensation from Infosys*," meaning they were paid in India. SAC at ¶ 17 (emphasis added). Curiously, the FAC also alleged that the trainers "received compensation in the form of continued salary benefits" from Infosys. ECF No. 37 at ¶ 17. However, the SAC deleted any mention of "continued salary benefits." Nonetheless, because the SAC alleges that the trainers were Infosys employees based in India who received compensation from Infosys, presumably as continuing employees of Infosys, that is enough to show the trainers were paid in India. *See Cole v. Sunnyvale*, 2010 WL 532428, at *4 (N.D. Cal. Feb. 9, 2010) ("The court may also consider the prior allegations as part of its 'context-specific' inquiry based on its judicial experience and common sense to assess whether the Third Amended Complaint plausibly suggests an entitlement to relief, as required under *Iqbal*."). Thus, Infosys' and the trainers' profits accrue overseas. This satisfies the BIA test's second prong.

In response, Krawitt first argues that there is a federal regulation that prohibits the trainers from coming to the United States under B-1 visas because the trainers were coming as part of a contractual agreement. Opp. at 4. Second, Krawitt asserts that *Matter of Hira* is not applicable to the instant case. *Id.* at 7. Third, Krawitt argues that a Northern District of California court previously rejected *Matter of Hira*'s reasoning in *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F. Supp. 1387, 1402-03 (N.D. Cal. 1985). Fourth, the SAC expands upon the FAC by alleging that the training consisted of "'paired training' in which both instructor and trainee take turns writing and revising computer code—which is exactly the sort of coding and programming work that the U.S. Government previously found unacceptable business activities when performed by holders of a B-1 visa." SAC at ¶ 12. The Court finds Krawitt's arguments unpersuasive.

First, Krawitt argues that the portion of the Code of Federal Regulations governing B-1 visas does not permit the trainers' activities in the United States. The regulation states:

> The term "business," as used in INA 101(a)(15)(B), refers to conventions, conferences, consultations and other legitimate activities of a commercial or professional nature. It does not include local employment or labor for hire . . . . An alien seeking to enter as a nonimmigrant for employment or labor pursuant to a contract or other

10
Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

prearrangement is required to qualify under the provisions of § 41.53 [specifying the requirements of an H-type visa].

22 C.F.R. § 41.31 (emphasis added). Krawitt argues that because the trainers were entering pursuant to the Agile Contract, they were ineligible to enter the United States under B-1 visas because the regulation "does not permit any work that is itself the subject of a contract or prearranged employment." Opp. at 5. However, Krawitt reads the regulation too narrowly, especially the portion about "seeking to enter as a nonimmigrant . . . pursuant to a contract or other prearrangement." 22 C.F.R. § 41.31.

Numerous authoritative sources contradict Krawitt's reading of the regulation. The BIA has repeatedly held that foreigners entering pursuant to a contract or a prearrangement may be granted B-1 visas. For instance, in *Matter of Camilleri*, the BIA permitted a Canadian citizen truck driver employed by a United States corporation to enter the United States on a B-1 visa to pick up loads in the United States and transport them back to Canada. 17 I. & N. Dec. 441, 441-42 (BIA 1980). The BIA allowed the driver to enter on a B-1 visa because he was "engaged in international trade which is *contracted for . . .* with companies in the United States and in Canada." *Id.* at 442. Furthermore, in *Matter of Duckett*, the BIA held that a Canadian railroad clerk permissibly entered the United States on a B-1 visa pursuant to an "interchange agreement" between companies that allowed for a Canadian railroad company to access railway cars stored at Niagara Falls, New York. 19 I. & N. Dec. 493, 493-94 (BIA 1987).

Moreover, the United States Customs and Immigration Service's ("USCIS") Operating Instructions specify that B-1 visas are appropriate for "[a]n alien coming to install, service, or repair commercial or industrial equipment or machinery purchased from a company outside the U.S. or *to train U.S. workers* to perform such service, provided: *the contract of sale* specifically requires the seller to perform such services or training." USCIS, Operating Instructions, OI 214.2(b)(5) (emphasis added).

Second, Krawitt asserts that *Matter of Hira* is not applicable to the instant case; rather, "*Hira* may have been applicable here if Apple was paying for services performed in India but not

11

Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

1 for services performed in the U.S.—and Dani and Vobugari's agile software development training course was not paid-for and merely incidental to services being performed in India." Opp. at 7. It is not entirely clear what Krawitt's argument is here. It appears that Krawitt is arguing that because Apple paid for services rendered here in the United States as opposed to overseas, *Matter of Hira* is inapplicable. However, as aforementioned, the facts of *Matter of Hira* are analogous to those of the instant case. In *Matter of Hira*, a Hong Kong suit manufacturer sent Hira to the United States to take customers' measurements for suits. 11 I. & N. Dec. at 825. Thus, Hira performed services in the United States—taking the customers' suit measurements—for which he was remunerated overseas. Likewise, here, the trainers were not paid directly from the Agile Contract; Infosys, which is based overseas in Bangalore, India, received the $50,000. SAC at ¶¶ 17, 40. The trainers were compensated as Infosys employees for their work, meaning that the trainers were paid in India. *Id.* at ¶ 17.

Third, Krawitt argues that *Bricklayers* supports Krawitt's position because *Bricklayers* suggests that courts should not rely on BIA opinions or on Immigration and Naturalization Service ("INS") Operating Instructions alone. Opp. at 7. Moreover, Krawitt claims that *Bricklayers* focuses "the inquiry strongly on the language of the Immigration and Nationality Act itself, . . . coupled with the purpose Congress sought to achieve in enacting it." *Id.* (internal quotation marks omitted). However, *Bricklayers*, which neither rejects *Matter of Hira*'s reasoning nor suggests that courts should not rely on BIA opinions or INS Operating Instructions, actually supports Apple's argument.

*Bricklayers* concerned an INS Operating Instruction allowing foreigners to come "to install, service, or repair commercial or industrial equipment or machinery purchased from a company outside the U.S. or to train U.S. workers to perform such service." *Bricklayers*, 616 F. Supp. at 1391 (quoting INS Operating Instruction 214.2(b)(5)). The *Bricklayers* court struck down the Operating Instruction for violating the Immigration and Nationality Act. *Id.* at 1399. The INS subsequently amended its regulations to bar B-1 visas to those coming to perform building or

12
Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

construction work themselves, but to allow B-1 visas to "those coming solely for the purpose of supervising and training others" in construction work. 51 Fed. Reg. 44266, 44266 (Dec. 9, 1986). Although *Bricklayers* dealt specifically with the construction industry, *Bricklayers* highlights the fact that the INS amended its regulations to permit aliens to enter the United States on a B-1 visa "*for the purpose of supervising or training of others*." 8 C.F.R. § 214.2(b)(5) (emphasis added). This is an explicit acknowledgement in the federal regulations that training can be a legitimate business activity conducted pursuant to a B-1 visa, albeit in the construction context.

Moreover, the State Department specifically allows B-1 visas for "[p]articipating in a training program that is not designed primarily to provide employment." *See* United States Department of State, *Business Travel to the United States* at 2 (Mar. 2014), available at https://travel.state.gov/content/dam/visas/BusinessVisa%20Purpose%20Listings%20March%202014%20flier.pdf (last visited Mar. 12, 2019).

Furthermore, finding that the trainers in the instant case permissibly entered the United States on B-1 visas is not inconsistent with the legislative intent of the Immigration and Naturalization Act. Krawitt's legislative intent arguments are specifically framed in terms of Congress' "continuing concern for the protection of American workers from unnecessary foreign competition." *Bricklayers*, 616 F. Supp. at 1401. However, the *Bricklayers* court found that only "unnecessary" foreign competition is precluded. *Id.* The Operations Instruction was amended after the *Bricklayers* litigation to bar B-1 visas to those coming to perform construction work themselves, but to allow B-1 visas to those coming to supervise or train others in construction work. Training American workers presumably enhances their employment opportunities in the United States, and thus protects them from unnecessary foreign competition.

Moreover, if Congress intended to shield all industries from foreign competition, then the B-1 visa likely would not exist. For instance, in *Matter of Cortez-Vasquez*, a Mexican national entered the United States around four times a week to clear brush from ranches to sell as firewood back in Mexico. 10 I. & N. 544, 544, 547 (B.I.A. 1964). This was held to be permissible

13

"intercourse of a commercial nature." *Id.* Presumably, American workers could have easily cleared the brush too, but that was insufficient for the Board of Immigration Appeals to rule in the government's favor.

Fourth, the SAC expands upon the FAC by claiming that the training consisted of "'paired training' in which both instructor and trainee take turns writing and revising computer code," which, according to Krawitt, is prohibited. SAC at ¶ 12. However, Krawitt's allegation ignores the distinction between *training*, regardless of whether the training occurs through paired exercises or in a larger group, and *performing the job itself*. Importantly, Krawitt's "paired training" allegation does not allege the trainers actually performed the trainees' jobs. This distinction is important as *Bricklayers* held that it was impermissible for foreigners under a B-1 visa to *perform* construction work, 616 F. Supp. at 1391, but subsequent immigration regulations determined that it was permissible for foreigners to enter the United States on a B-1 visa "*for the purpose of supervising or training of others*." 8 C.F.R. § 214.2(b)(5) (emphasis added). Thus, the SAC's "paired training" allegation does not change this Court's analysis.

In sum, the Court holds that the two trainers provided permissible training under a B-1 visa.

### B. Scienter

Second, assuming *arguendo* that the trainers were incorrectly admitted into the United States on B-1 visas, Apple argues that Defendants do not have the requisite scienter to be charged with a violation of the FCA. Mot. at 9. The Court agrees.

The FCA requires that a defendant have "actual knowledge" of a false claim or acted with "deliberate ignorance" or "reckless disregard." 31 U.S.C. § 3729(b)(1). The FCA's scienter requirement is "rigorous." *United States. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176 (9th Cir. 2016). "[I]nnocent mistakes, mere negligent misrepresentations and *differences in interpretations* are not sufficient for False Claims Act liability to attach." *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (emphasis added) (internal

14

Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

quotation marks omitted). A good-faith interpretation of a regulation does not meet the FCA's scienter requirement. *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999). "[E]stablishing even the loosest standard of knowledge, i.e., acting in reckless disregard of the truth or falsity of the information[,] is difficult when falsity turns on a disputed interpretive question." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015) (internal quotation marks omitted).

As discussed above, the allowable business activities under a B-1 visa are not well-defined. *See, e.g.*, *Matter of Hira*, 11 I. & N. Dec. at 827 ("Considerable difficulty has been experienced in the past in arriving at a clear and workable definition of 'business' . . . .); 9 FAM 402.2-5(A)(b) ("It can be difficult to distinguish between appropriate B1 business activities, and activities that constitute skilled or unskilled labor in the United States that are not appropriate on B status."). Thus, there is ambiguity in the allowable uses of B-1 visas arising out of differences in interpretation of the relevant immigration laws and regulations. The ambiguity here is in Apple's and Infosys' favor. Apple and Infosys cannot be charged with knowledge or willful blindness to the correct uses of the B-1 visa because there is simply no exhaustive list or case law of all permissible activities under a B-1 visa. *See* 22 C.F.R. § 41.31(b)(1) ("The term 'business' . . . refers to conventions conferences, consultations *and other legitimate activities of a commercial or professional nature*" (emphasis added).). Moreover, there is no case law or regulatory guidance stating that providing training is *impermissible* under a B-1 visa.

Furthermore, all Krawitt alleges about scienter is that he notified his superiors at Infosys and managers at Apple of the purported illegality of using B-1 visas to bring the trainers into the United States. *See* SAC at ¶ 15 ("[B]oth Infosys and Apple knew that these actions violated applicable laws" after Krawitt warned them about using trainers on B-1 visas). Again, it is not clear from the text of the regulation that providing training is not a legitimate commercial or professional activity under a B-1 visa. As discussed above, providing training and supervision in the construction industry is allowable under a B-1 visa. There is no indication in the regulations

15
Case No. 16-CV-04141-LHK
ORDER GRANTING APPLE INC.'S MOTION TO DISMISS WITH PREJUDICE AND DENYING INFOSYS TECHNOLOGIES, LTD.'S MOTION TO DISMISS AS MOOT

1 that providing training in other industries is disallowed. Thus, Krawitt's allegation that he notified

2 Infosys and Apple of the trainers' use of B-1 visas does not show that Infosys or Apple knew or

3 were willfully blind to the alleged illegality of hiring B-1 visa holders to provide the training.

Krawitt claims that "[t]he false statements that Apple and Infosys made [in the invitation letters] betray an intimate knowledge by both Apple and Infosys employees of the exact provisions of the Immigration and Nationality Act that they were violating." Opp. at 9. Krawitt also points to his allegation that the trainers were instructed to travel back to India and then return to the United States to avoid suspicion for violating immigration laws. *Id.* at 10. Thus, Krawitt claims that the Apple and Infosys' actions show scienter.

However, Apple and Infosys' subjective intentions here are irrelevant to the determination of whether, *objectively*, the immigration laws were clear enough to put Apple and Infosys on notice so that Apple and Infosys knew or were willfully blind to the trainers' allegedly impermissible use of the trainers' B-1 visas. *See Hendow*, 461 F.3d at 1174 ("[D]ifferences in interpretations are not sufficient for False Claims Act liability to attach."). Krawitt points to no authority for the proposition that a *subjective* belief that an entity was violating the law is enough for FCA liability to attach. Moreover, Krawitt still fails to direct the Court to any authoritative guidance from the government establishing that providing training was *not* allowable under a B-1 visa. All Krawitt is able to allege is that his own warnings put Apple and Infosys on notice that Apple and Infosys were violating immigration laws. *Id.* at 10. However, Krawitt's warnings are not enough to establish Apple's and Infosys' liability. Where the law is ambiguous, an FCA plaintiff must show "sufficient record evidence that there was 'guidance from the courts of appeal' or relevant agency 'that might have warned [the defendant] away from the view it took.'" *Purcell*, 807 F.3d at 289 (quoting *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 70 (2007)). Indeed, Krawitt is not the authoritative source on statutory and regulatory interpretation of United States visa policy that the United States Supreme Court in *Safeco* contemplated.

In sum, because of the vagueness of the regulations governing B-1 visas, Apple and

1  Infosys did not have the requisite scienter to commit fraud under the FCA.

## IV. CONCLUSION

For the foregoing reasons, Apple's motion to dismiss the second amended complaint is GRANTED. At bottom, Krawitt's failure to plead an FCA claim is a legal deficiency that cannot be cured with amended factual pleadings because the Court held the trainers permissibly entered the United States on B-1 visas, and because the Court determined that the immigration laws are not clear as to the permissible uses of a B-1 visa. This reasoning applies equally to Krawitt's FCA claim against Infosys. Thus, the Court dismisses Krawitt's FCA claim against Infosys and DENIES Infosys' motion to dismiss the second amended complaint as moot.

The Court's order granting Apple's previous motion to dismiss warned that "failure to cure the deficiencies . . . will result in dismissal with prejudice." *Krawitt*, 342 F. Supp. 3d at 968. Despite this warning, Krawitt's SAC fails to cure the previously-identified deficiencies. The SAC is Krawitt's third complaint. Because further amendment would be futile, and it would be unduly prejudicial to Apple and Infosys to litigate a third motion to dismiss regarding the same deficiencies, leave to amend is DENIED.[2] *See Leadsinger*, 512 F.3d at 532.

**IT IS SO ORDERED.**

---

[2] Krawitt argues that he should have leave to amend his complaint because "new documents and facts continue to come to light involving these violations and defendants have recently produced a subset of those documents." Opp. at 18. However, as stated above, Krawitt cannot cure his claim's legal deficiency with amended factual pleadings. Moreover, courts have held that "a qui tam relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 231 (1st Cir. 2004), *abrogated on other grounds as recognized by Guilfoile v. Shields*, 913 F.3d 178 (1st Cir. 2009); *see also United States v. Safran Grp., S.A.*, 2017 WL 3670792, at *15 (N.D. Cal. Aug. 25, 2017) ("As insiders, Relators should be able to comply with Rule 9(b) based on their insider knowledge" (internal quotation marks omitted)); *Periguerra v. Meridas Capital, Inc.*, 2010 WL 395932, at *5 (N.D. Cal. Feb. 1, 2010) ("Rule 9(b) does not permit a party to make conclusory allegations and then, through the discovery process, gain more specific information and amend its pleadings to satisfy the particularity requirement . . . .").

Dated: March 12, 2019

*Lucy H. Koh*
LUCY H. KOH
United States District Judge